***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except for minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer on 27 January 2001.
3. Plaintiff sustained a compensable injury by accident on 27 January 2001 when she was assaulted by a combative patient.
4. Plaintiff came under the care of Dr. Eric L. Rhoton, a neurosurgeon. On 20 March 2001, Dr. Rhoton performed a left T8-9 diskectomy on plaintiff, who was out of work from 11 March 2001 until she returned to work on 19 November 2001. From 12 April 2001 until 19 November 2001, plaintiff received temporary total disability benefits at a rate of $585.83 per week.
5. The parties further stipulated to the following: (a) plaintiff's medical records; (b) Industrial Commission forms; (c) discovery responses; (d) miscellaneous correspondence; and (e) check stubs.
6. Following the hearing before the deputy commissioner the depositions and medical records of Dr. Eric L. Rhoton; Dr. Brison O. Robertson; Dr. Jeffrey R. Coston; Karen Grogan, RN; and Roger Mead, PT were submitted and received into evidence.
 ***********
Based on the foregoing stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was a 53-year old female with a bachelor's degree in nursing. Plaintiff had been a nurse for approximately 25 years. Plaintiff was hired to work as a nurse with defendant-employer on June 23, 1997. Plaintiff had previously worked for defendant as a nurse, and in total worked for defendant as a nurse for approximately ten years.
2. On January 27, 2001, plaintiff was performing her duties as a nurse in defendant's emergency room. In the performance of her duties, plaintiff was asked to help start an I.V. on a patient.
3. The patient weighed between 250 and 300 lbs. and was agitated and combative. The patient assaulted plaintiff, striking her at least three times about the face, neck, back, head and shoulders, resulting in plaintiff falling to the floor.
4. Frank Luther, a certified nursing assistant and Walt Ingle, a security guard came to plaintiff's assistance.
5. Plaintiff reported the assault and injuries to her charge/managing nurse, Glenda Sanderson, RN, who completed an "Employee Occurrence Report" on January 27, 2001. Mr. Luther and Mr. Ingle were listed as "eyewitnesses" to the assault. Another incident report was completed by the Security Department on January 27, 2001, all of which described the assault on plaintiff.
6. A January 27, 2001 "Work Status Summary" was prepared which noted that plaintiff was starting an I.V. on a combative patient and that there were three security officers present who pulled the patient off plaintiff after she had been struck three times about the head.
7. One of the other nurses on duty in the emergency room at the time of the assault, Rita Moss, RN, did not witness the attack, but testified that she viewed the redness to the back of plaintiff's neck immediately after the assault.
8. After the incident on January 27, 2001 plaintiff spoke with Dr. Hunt, an emergency room physician on duty who gave her samples of a muscle relaxant, Flexeril. Plaintiff completed her shift. Following January 27, 2001, plaintiff continued to work for defendant and did not complain to her supervisor.
9. However, because plaintiff continued to experience pain, discomfort and incontinence, she sought medical treatment. Plaintiff did not notify her employer that she was seeking medical treatment with her family physician, Brison Robertson, M.D. on March 9, 2001. Based upon Dr. Robertson's examination of plaintiff, an MRI of her lumbar and thoracic spine was ordered. Dr. Robertson then referred plaintiff to Eric L. Rhoton, M.D., a board-certified neurosurgeon.
10. On March 16, 2001 Dr. Rhoton diagnosed plaintiff with central and left-sided T8-9 herniated nucleus pulposus with associated thoracic myelopathy, neurogenic bowel and bladder dysfunction, degenerative lumbar scoliosis with associated lumbar spinal stenosis at L4-5, severe latex allergy and pruritus with morphine, excessive sedation and decreased level of consciousness with Demerol in the past. Dr. Rhoton recommended surgical decompression of plaintiff's thoracic disc herniation with associated cord compression and stated that in his opinion, the disc herniation was work-related.
11. Also, on March 16, 2001 plaintiff first spoke with her immediate supervisor about the recommended thoracic surgery already scheduled four days later and the causal relationship between her work-related assault and her need for surgery. Since plaintiff had continued working full time and had not informed defendant of any related problems, this was the first notice that defendant received that there were any lingering injuries as a result of the January 27, 2001 incident and the first notice this complaint required medical assistance. Further, since defendant did not have copies of plaintiff's medical records nor had they an opportunity to review these records, she was advised to apply for Family Medical Leave Act (FMLA) benefits for her time out of work. In addition, due to concern about the interaction of workers' compensation benefits and FMLA benefits, plaintiff was directed to defendant's workers' compensation administrator, Mary Silver, who advised plaintiff to file her expenses for her surgery scheduled four days later with plaintiff's health insurance carrier until medical reports could be obtained and reviewed and a determination could be made regarding workers' compensation.
12. Plaintiff was admitted to the hospital March 20, 2001, had surgical repair of T8-T9, and was discharged March 22, 2001. On March 25, 2001, just three days after her surgical discharge, plaintiff returned to the emergency room because of fever, nausea, fatigue, back pain and numbness and weakness in her legs.
13. On March 28, 2001, plaintiff provided defendant with a recorded statement detailing the origin, nature and extent of her injuries from the January 27, 2001 assault.
14. Plaintiff returned to the emergency room again on April 9, 2001 for fever and chills.
15. Defendant filed a Form 61 dated April 18, 2001, denying plaintiff's workers' compensation claim in order to obtain plaintiff's medical records including the operative report in order to determine whether her current problem was work-related.
16. Subsequently defendant filed a Form 63 dated May 7, 2001, commencing payment of temporary total disability benefits to plaintiff without prejudice as of April 12, 2001, even though plaintiff had been unable to work since March 11, 2001.
17. Plaintiff filed a Form 18 Notice of Accident with the Industrial Commission on May 17, 2001.
18. Plaintiff's first check covering the period April 12, 2001 through May 11, 2001 in the amount of $2,510.70 was issued by defendant. Plaintiff was never paid for the period March 11, 2001 through April 11, 2001.
19. Dr. Rhoton saw plaintiff on May 22, 2001 and noted that she was still unable to work. He referred her for work conditioning/physical therapy.
20. In June 2001, plaintiff complained to Dr. Rhoton of continued neck pain and periods of numbness to her left arm. She reported that she had gotten hurt during physical therapy and could not continue. Dr. Rhoton recommended a cervical MRI, which defendant refused to authorize.
21. On July 13, 2001 plaintiff suffered from a severe headache, which was the result of viral meningitis that led to her hospitalization on that day.
22. Plaintiff saw Dr. Rhoton on July 23, 2001 for development of pain in her neck, bilateral arm pain, hand numbness, tremor in both upper extremities and residual left thoracic pain. Plaintiff continued to be written out of work.
23. On August 10, 2001, plaintiff had the cervical MRI, which was paid for by her health insurance carrier. She presented to Cecil Durham, M.D. for nerve conduction and EMG studies, which were negative for carpal tunnel.
24. Dr. Rhoton reviewed the cervical MRI and noted cervical spondylosis at C4-5, C5-6 and C6-7, but felt that there was no significant cord depression. He did not believe any surgery was warranted at that time.
25. On August 13, 2001, plaintiff filed a Form 33 Request for Hearing due to the failure of defendant to supply recommended medical treatment and for failure to pay plaintiff for time out of work due to the injury.
26. Despite a specific request from plaintiff that her compensation checks be mailed to her and repeated requests from plaintiff's counsel, defendant refused to mail plaintiff's checks to her home, in violation of N.C. Gen. Stat. § 97-18(a) and N.C.I.C. Rule 403, forcing plaintiff to come to Mission St. Joseph's Health System to pick up her weekly checks. According to Mary Silver the defendant's policy is that all temporary total disability checks from their third party administrator, Cambridge Integrated Services, Inc. are reviewed by her office to insure that the check is accurate and timely and to give defendant an opportunity to check-in with the employee to see if "everything is going right." The individual checks are then placed in a sealed envelope and given to each employee.
27. After plaintiff's attorney's repeated requests to have plaintiff's checks mailed directly to her failed, plaintiff sought an order from the Industrial Commission. The Executive Secretary's Office issued an August 29, 2001 Order directing that all checks be mailed to plaintiff's home.
28. During plaintiff's September 5, 2001 appointment with Dr. Rhoton, he found plaintiff to be improved and interested in returning to work. On that date, he reviewed two job descriptions that had been submitted to him by both plaintiff and Mary Silver and believed that either job would be reasonable. He recommended that plaintiff return to sedentary work, eight hours per day with possible increase of activities based on future results from a functional capacity evaluation (FCE). The FCE was performed on September 17, 2001 and showed plaintiff capable of working at a medium physical demand level. At that time, Dr. Rhoton believed plaintiff's back was at maximum medical improvement and issued a 10% (ten percent) permanent partial impairment rating to her back. However, 2 years later during his deposition testimony, he changed his opinion and withdrew the rating. He then deferred a final rating until plaintiff reached maximum medical improvement. Dr. Rhoton stated that follow-up care would be rendered by plaintiff's family physician. Plaintiff continued to remain out of work.
29. On September 18, 2001, defendant filed a Form 33R stating that plaintiff was "not presently disabled, has not returned to work, and claims for medical compensation are not related to 1/27/01 injury." As of September 18, 2001, defendant was paying temporary total disability benefits to plaintiff.
30. On October 17, 2001 plaintiff underwent surgical repair of an anal tumor. On November 11, 2001 due to acute bleeding, plaintiff underwent a revision of her posterior surgery.
31. In a November 11, 2001 work note, Dr. Rhoton stated that plaintiff could return to work eight hours per day, as tolerated, and she could increase her hours to full shift when she felt able to do so. Plaintiff applied for available jobs within her restrictions.
32. Plaintiff returned to work part-time as an I.V. nurse on November 19, 2001. Plaintiff was subsequently able to work full time in this position.
33. On November 30, 2001, defendant filed a Form 28 Return to Work Report with the Industrial Commission and terminated plaintiff's temporary total disability benefits. When her temporary total disability benefits stopped, she was working full-time as an I.V. nurse.
34. The parties' attempt to mediate this matter on January 3, 2002 was unsuccessful. Two days later, on January 4, 2002 plaintiff returned to Mountain Neurological Center on her own accord and was seen by John Kennedy, PAC who worked with Dr. Rhoton. Plaintiff informed Mr. Kennedy that the attorneys were about to settle her case for a 10% permanent partial impairment rating to her back but she had developed some low back pain which Mr. Kennedy believed she wanted evaluated as part of the settlement. Plaintiff complained of having paraspinous muscle spasms in the T10 area and low back pain in the L4-5 area with muscle spasms. A lumbar MRI was performed on January 11, 2002. This MRI showed advanced lumbar degenerative disk disease, narrowing of disk space, and moderate spinal stenosis. These were pre-existing degenerative conditions in plaintiff's spine. Earlier Dr. Rhoton had found no acute pathologies requiring surgery and noted that there was no significant change from the initial MRI that was performed in March of 2001.
35. Plaintiff returned to see Dr. Rhoton on February 13, 2002, complaining of chronic low back and hip pain, and was referred to Jeffrey Coston, M.D., a board-certified anesthesiologist, for pain management. Dr. Coston treated plaintiff from April 2002 through August 2002, when the pain management clinic closed.
36. Plaintiff returned to Dr. Rhoton in the fall of 2002 and subsequently had an L4-L5 lumbar laminectomy due to continuing low back, right hip and leg pain. At the time of the September 26, 2002 hearing before the deputy commissioner, plaintiff had been written out of work for the period from September 6, 2002 through September 23, 2002. Plaintiff was written out of work again on October 19, 2002.
37. Plaintiff continued to have problems and her care was transferred to Jonathan Sherman, M.D., another surgeon at Mountain Neurological Center. Plaintiff was readmitted to the hospital on February 12, 2003 for additional thoracic and lumbar surgery, fusion of the vertebrae between T10 and S2 in order to stabilize the discs, which had degenerated as a result of the scoliosis and EBI bone growth stimulation. Plaintiff has not reached maximum medical improvement. She last worked for defendant on September 5, 2002.
38. Dr. Rhoton, board certified neurosurgeon, opined that plaintiff's treatment for her cervical, lumbar and thoracic spine was related to her work injury because even though she had pre-existing degenerative changes, they were asymptomatic prior to the January 27, 2001 assault. He specifically opined that the January 27, 2001 assault on plaintiff contributed to her lumbar condition and was the direct cause of plaintiff's cervical and thoracic spinal conditions.
39. Dr. Robertson, plaintiff's family physician, was of the opinion that plaintiff's back problems were all a result of the January 27, 2001 injury because although she had pre-existing degenerative problems in her spine, she was asymptomatic prior to the assault. He further opined that plaintiff's lumbar spine had pre-existing bony and disc abnormalities, but were asymptomatic until her January 27, 2001 assault. He stated, "I think that the pain from her lumbar problems was caused by the injury." He also testified that plaintiff had suffered from depression since her injury due to the emotional reaction of the injuries and being unable to work.
40. Dr. Coston opined that plaintiff's complaints of pain were real. He based this opinion on his discussions with the plaintiff and her motivation to continue working. He was of the opinion that the sequelae of the injury were the cause of her pain.
41. Roger Meade, physical therapist at Mountain Neurological Center, was of the opinion that physical therapy and work conditioning did not cause plaintiff any increase of pain.
42. As of October 3, 2002, plaintiff's medical expenses as a result of her injuries totaled $44,580.03. Plaintiff's health insurance has paid much of this expense.
43. Defendant contends that the correct average weekly wage is $878.70 and the compensation rate is $585.83. This is based on defendant's calculation of plaintiff's wages of $45,692.46 for the 52 weeks prior to the injury as based on their Form 22. However, defendant has included $1,558.74 earned for the 2 week period ending February 3, 2000, whereas only the wages attributed to the period for the 7 days from January 28, 2000 through February 3, 2000 should be included. Defendant then included the amount earned by plaintiff for the period ending February 26, 2000 in their calculation of the total earned by plaintiff for the month of March. Finally, defendant failed to include $2,017.63 earned by plaintiff for the period ending January 27, 2001. Therefore, the resulting calculations submitted by defendant are inaccurate. Plaintiff alleges that the correct average weekly wage is $887.52, yielding a compensation rate of $591.70. However, plaintiff's calculation of $887.52 is inaccurate, because plaintiff divided the wages by 52 weeks instead of 365 days. Given the limited information submitted by both parties, the correct method to calculate plaintiff's average weekly wage and compensation rate is to divide the sum of $46,151.35 by 365 days, multiply the quotient by 7 days and multiply that product by .6667 ($46,151.35/365 days = 126.44 × 7 days = $885.08 × .6667 = $590.08). Thus, plaintiff's average weekly wage is $885.08, which yields a compensation rate of $590.08.
44. The temporary total disability benefits for the period April 12, 2001 through November 23, 2001 which were paid at the rate of $585.83 is $4.25 less than the proper compensation rate ($590.08 — 585.83 = $4.25).
45. On January 27, 2001, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant when a combative patient assaulted her. As the direct and natural result of her injury by accident, plaintiff suffered physical injuries to her head cervical, thoracic and lumber back and suffered from depression.
46. As a result of plaintiff's injury by accident of January 27, 2001 and resulting medical problems, plaintiff was unable to earn wages in any capacity from March 11, 2001 to November 18, 2001 and from September 6, 2002 through September 23, 2002 and from October 19, 2002 and continuing. She is owed temporary total disability benefits at the weekly rate of $590.08, less credit for temporary total disability benefits already paid at the lower rate.
47. Defendant's refusal to mail plaintiff's compensation checks directly to her after plaintiff filed written requests, which required plaintiff to seek an Order from the Executive Secretary was unreasonable.
48. The denial of this claim was not without justification and due cause, and the reasons for the hearing were not engendered by unfounded litigiousness.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On January 27, 2001, plaintiff sustained an injury by accident resulting from an assault by a combative patient, arising out of and in the course of her employment with the defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. As the direct and natural result of her January 27, 2001 injury by accident, plaintiff developed cervical, thoracic and lumbar spinal problems resulting in three surgical procedures and depression. N.C. Gen. Stat. § 97-2(19).
3. As the result of her January 27, 2001 injury by accident and related depression, plaintiff is entitled to have defendant pay temporary total disability benefits at the rate of $590.08 per week for the period March 11, 2001 through November 19, 2001 with credit for temporary total disability benefits already paid at a lower rate. In addition, plaintiff is entitled to have defendant pay temporary total disability benefits to plaintiff at the rate of $590.08 per week from September 6, 2002 through September 23, 2002 and from October 19, 2002 and continuing until such time as she returns to work, or until further Order of the Commission. N.C. Gen. Stat. § 97-29.
4. Since plaintiff has not previously been paid for the period from March 11, 2001 through April 11, 2001, plaintiff is entitled now to compensation for this period as directed above in Conclusion of Law #3 and in addition is entitled to a 10% late payment penalty. N.C. Gen. Stat. § 97-18(g).
5. Further, plaintiff is entitled to interest on the unpaid portion of the amount at the legal rate of interest provided in N.C. Gen. Stat. §24-1, which is owed from the date of the initial hearing of the claim and is not subject to an attorney's fee. N.C. Gen. Stat. § 97-86.2.
6. As the result of her January 27, 2001 injury by accident and related depression, plaintiff is entitled to have defendant pay for all related medical and psychological expenses necessitated by her January 27, 2001 injury by accident for so long as such treatment is reasonably required to effect a cure, provide relief and/or lessen her disability. N.C. Gen. Stat. §§ 97-25; 97-25.1.
7. Defendant is not entitled to an offset for plaintiff's sick and vacation time used during the time that she is now paid temporary total disability benefits. N.C. Gen. Stat. § 97-42; Estes v. North CarolinaState University, 102 N.C. App. 52, 401 S.E.2d 384 (1991).
8. Defendant is not entitled to credit for any short-term or long-term disability benefits paid to plaintiff through defendant-employer's disability plan, which was funded by plaintiff. N.C. Gen. Stat. § 97-42.
9. The refusal of defendant to mail plaintiff's checks directly to her after repeated requests requiring plaintiff's attorney to request an Order from the Executive Secretary was unreasonable. Thus, plaintiff's attorney is entitled to $500.00 as a reasonable attorney's fee to be paid by defendant. N.C. Gen. Stat. § 97-18(a) and N.C.I.C. Rules 403 802.
10. However, there were substantial questions of law and fact in this matter and therefore defendants' defense of the claim was based on reasonable grounds. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee hereinafter, approved defendant shall pay plaintiff temporary total disability compensation at the rate of $590.08 per week for the period from March 11, 2001 through November 19, 2001 with a credit for temporary total disability benefits previously paid; in addition, defendant shall pay a 10% late payment penalty on the compensation owed for the period from March 11, 2001 through April 11, 2001. Defendant shall further pay temporary total disability benefits to plaintiff at the rate of $590.08 per week from September 6, 2002 through September 23, 2002 and from October 19, 2002 and continuing until such time as she returns to work, or until further Order of the Commission.
2. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury, including reimbursement to the health insurance payors, when bills for same have been submitted to and approved according to procedures adopted by the Industrial Commission, for so long as such treatment may reasonable be required to effect a cure, give relief or lessen plaintiff's period of disability.
3. Defendant shall pay $500.00 to plaintiff's attorney for the time expended to have defendant ordered to mail plaintiff's checks directly to her home.
4. An attorney fee of 25% of the compensation awarded to plaintiff in Paragraph 1 of this award is approved. Of the accrued amount, defendant shall deduct 25% and send directly to plaintiff's attorney. Of the continuing amount, defendant shall send every fourth check to plaintiff's counsel.
5. Defendant shall pay to plaintiff interest not subject to an attorney's fee on the unpaid portion of this award in the amount of 8% from the date of hearing before the Deputy Commissioner.
6. Defendant shall pay the costs, including expert witness fees, if not already paid.
This the 8th day of April 2005.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
DISSENTING IN PART:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER